Good morning, Counsel. Good morning, Honors. May it please the Court, Elizabeth Lin, with the Lin Law Firm, appearing on behalf of Appellants, Plaintiffs, Ronald Allen, Jr., and others. I would like to reserve three minutes for rebuttal. This case involves atrocious and egregious violations of plaintiffs' civil and property rights by the defendants. The defendant is not guilty. This is a due process case. It is a due process case. Why didn't you bring it under the habeas rights then? Well, because under habeas corpus, you can only bring that if the plaintiffs are detained. So you had to find a way around that? No, not necessarily. So then you've alleged it differently? I mean, it seems to me this is the same case we had in Gifredo. It's not, Your Honor. Well, I mean, other than in Gifredo, they saw it for what it was, due process. They filed it under the Habeas Act, and we had to determine if they were detained. And to be fair, that was a very tough question for me, because I think it is absolutely, positively, without doubt, a terrible thing that happened there and happened here, for simply why it happened. But I'm kept out. And so I said, well, I've got to find whether it's detained, and I don't think it is. And we had a great district judge who wrote a great dissent, say they are detained. We went all the way to the Supreme Court, and they said they weren't detained. And I guess I'm having a tough time. It seems to me you've got the same case. You're just trying to plead it differently. I disagree, Your Honor. And the reason why that is is because this case is extremely unique. First of all... It can only be unique. That's true. If there's only one, it is only one. But there are some really distinguishing facts in this case. Well, let's assume this is terrible conduct, and we have to. It's all alleged in the complaint. We take it all as true. They're not being detained for purposes of 1303, I think it is, right? Your clients haven't been... Have your clients been excluded from any physical areas? I don't believe so. So we're not talking about a habeas case. As bad as the conduct that is alleged is, doesn't it in the end require us to question the decisions of a sovereign? If these decisions had been made by the state of Mexico or the state of Canada, we couldn't question them. Why can't we question them? Because we have a sovereign tribe here. Well, that's really the point, Your Honor. It is. Tell me how I get past sovereign immunity. That's what the defendants here were not acting on behalf of the tribe. Well, just a minute. It doesn't matter how many times they raised their hand. The bottom line is, these people can't get what they want. They wouldn't have any damages if they weren't disenrolled. They'd still be members of the tribe if they weren't disenrolled. So the disenrollment caused whatever problem they had. It didn't have anything to do with anything else. The voting didn't make any difference. It was the very fact that after that, there was an order said, you're out. You're disenrolled. Which, in fact, that disenrollment caused your damages. It caused the fact that you can't be members. And at that point, I have a tough time understanding how I can get in this case at all to make you get what you want. Because every time I try, I'm beating in on the tribe. Well, this is where I need to give you an explanation. The tribe is not the defendants. The defendants are a committee of the tribe. The tribe is made up of adult They voted on and passed a resolution saying that Marguerite of Britain, the ancestor of these plaintiffs, she was of full blood. And what the defendants did is they unilaterally But the defendants did it under the, if this were a state, we'd say under color of state law. In your case, I guess we'd say under color of tribal law. It was the committee that the ordinance gave this power to. They were the members of the committee. They may have been motivated by the most evil motives. That's what you allege. But if after all, if this weren't a tribal action, you wouldn't be here. If the tribe hadn't disenrolled your clients, you wouldn't be here. So at the end, it was a tribal action, wasn't it? It was done by the officers of the tribe. And so I'm still trying to figure out how we get past. Sovereign immunity sort of tells us the officers of the tribe are entitled to do all sorts of bad things. And your remedies are not with the federal courts. How do we get past it? Well, first of all, I disagree that is an act of the tribe, because the defendants were not properly constituted. They had a six member committee. If it's not the action of the tribe, they're not disenrolled. Well, the problem here is that the defendants essentially usurped the power of the tribe. But then doesn't that get us into figuring out whether or not tribal government followed its own rules? And that's what we're not supposed to do. We're not supposed to interfere in the tribal government. They acted on behalf of the tribal government. It facially looks like it was done by the tribal government. And you're saying, well, not really, because there were errors along the way. But we're not supposed to get into those errors, are we? Well, there's actually two parts to that. It's not just the tribal government that had already determined that Margarita Burton was a full of blood. But you're not making a collateral estoppel argument. I am in a sense, because the Department of the Interior had also separately found that she was a full of blood. And what law do we, or case do we say that the Department of Interior's 1989 administrative decision is a law that is entitled to collateral estoppel? Well, it was not appealed. Well, that doesn't make any difference. Was the tribe a party to that case? Yes, it was. The tribe opposed, in the Indian, in the Bureau of Indian Affairs, did the tribe oppose the determination that your client would be determined to be a full blood? I don't know the specifics of that, but I do not believe they did. I just thought it was an application by her to have her status determined. It was an application by her descendants to have her status determined. That's what I understood. So in normal collateral estoppel cases, we wouldn't bind a party who wasn't there to a judgment, would we? Well, there was an opportunity for the tribe to intervene. I want to hear sort of your best argument about why this case is different than all the cases we've had in which we've said we can't intervene. Okay. First of all, even though defendants keep referring to themselves as the tribe, they're not the tribe. The governing body of the Palaban is the General Counsel, and they had already determined that Margarita Burton was a full blood. So essentially, when the defendants unilaterally decided that she wasn't, they actually subverted the will of the tribe. That's what I asked before. That's an argument that says to me, you've got to dig down into the way the tribe is being run and determine that this action really wasn't appropriately taken on behalf of the tribe. And that's why I run up against this wall of sovereign immunity that says, stay out of this stuff, federal courts. Let the tribe govern itself. If they have an internal problem, they should deal with it internally. So how does that get me past sovereign immunity? Well, first of all, the defendants made a facial attack on the complaint. And in that instance, the allegations of the complaint must be taken as true. So I don't think you actually even need to go there, because you need to accept the allegations as they are. And second of all, to the extent that it requires the court to... But I take the allegations as they are. Your allegations are, this group of plaintiffs, which comprised a committee, or at least were members of a committee of the tribe, acted far beyond their powers as members of this committee. That's what you allege. And that is a classic allegation that tells us, get into tribal government and figure out whether they acted correctly as members of the committee. And the Supreme Court has told us we can't do that. So how do I... The fact that you allege that doesn't get me past it. What else gets me out of the sovereign immunity box in this case? Okay. The other thing is the tribe's constitution. It specifically incorporated the protections of the Indian Civil Rights Act, which is a federal statute. Which you could have come under habeas, and you didn't want to. Because the only way you can sue under ICRA is for habeas, right? That's true. But that protection was specifically provided to disenrollments. Well, frankly, that's exactly why in the last Gifredo case, they did exactly what I thought you needed to do here, which was go under ICRA and come in and do what you had to do. But you had Gifredo sitting right there in front of you. And the Supreme Court had said, we're not even intervening in this. What the Ninth Circuit did is absolutely right. It just seems to me that this is another way around what was exactly what ICRA said you needed to do. I respectfully disagree, Your Honor, because... You just said what I just said. Now I'm parroting it, and you're saying now you disagree? Well, in the sense that this case is unique, because here you also have the Department of Interior issuing a final decision. Let me ask you this. Imperial Granite Company v. Paula Band of Mission Indians, which I specs the same, I'm not sure, says, and I quote, the votes individually of the EC have no legal effect. It is the official action of the board following the votes that caused the alleged injury. And then said, that makes it a tribe and a tribal action. And it's absolutely clear that the Paula Band, an Indian tribe, possesses common law immunity from suit traditionally enjoyed by sovereign powers. Seems to me that we've had Paula in front of us before with similar arguments about this being nothing more than a vote of EC. And we said in 1991, no way. How do I get around that decision? Well, first of all, this particular group committee, they were not properly constituted two out of the six had criminal convictions. That again, those are votes. That doesn't have anything to do with it. The board had an official action that was entered. The board's action is the only reason there's injury. Not good injury, not injury that I'm going to step up and say I'm glad. In fact, when I wrote Gifredo, I wrote it with tears in my eyes. But that doesn't mean anything. That just means, as my good colleagues tried to say, this is a sovereign. My ability to get in what this sovereign does is just limited, whether I like it or whether I don't. But the thing is, the defendants here didn't have authority to do what they did because the tribe had already made a determination. Well, but then the tribe changed. At least for purposes of our case, the board, at the end of the day, issues a disenrollment, correct? Correct. And so it changed its mind. It may have, under tribal law, it may not have been allowed to do that, but it changed its mind. I'm very sympathetic to your clients in this case on these allegations because it seems to me an injustice has been done. But taking your complaint is true. But we have an official action of the tribe. And how do we, our cases say you can't look behind that to figure out whether the procedures were good. It seems your argument comes down each time to the fact that they are stopped from doing what they did by the prior action of the Bureau of Indian Affairs. So every time somebody asks you a question, you say, well, I mean, Judge Hurwitz says, well, they changed their mind. Well, what's wrong with that? And your answer is they can't do it because of the prior decision. Is that basically your argument? I mean, why can't they do what they did and change their mind? Well, they can't do what they did because, first of all, the tribe had already issued a decision in regards to the same issue. And so did the DOI. Take out all the conspiracy and other stuff. Could the tribe just say, gee, we made this decision 15 years ago. We think we were wrong. We're changing it. We changed our minds. Could they, I don't know whether they could do that under Apollo law, but can we then intervene? Well, let me just address the issue of whether you can look behind tribal law. Because case law is very clear that in order to have sovereign immunity, in order to have that extended to the defendants, tribal officials, they must have been acting in their official capacity and the scope of their authority. So we need to look at that. And in order to look at that, because inherently their powers come from tribal law, to say that you can't examine tribal law, well, that would eviscerate that rule. But they did act in their capacity as members of the executive committee. You say they shouldn't have been on the committee. The committee was improperly constituted. But the actions were taken as members of the executive committee, and then the board ratified it. Is that a fair summary? The board ratified it? Well, I mean, it entered an order. It disenrolled your clients. Actually, I believe it was a letter that was simply sent to my client. I understand, but the letter was from the board, right? Correct. But whether that constitutes official action is very questionable, given that they've subverted, actually, the will of the tribe. So in this particular instance, where they went out of their way in order to retaliate against my clients by disenrolling them, I think the court can analogize this case to, for example, Lacey v. Maricopa. In that particular instance, a special prosecutor, he targeted owners of a newspaper because they had published some articles. I'm very familiar with that case, but it's not a sovereign immunity case. It's an official immunity case, and once you show bad enough conduct, we get past official immunity. For sovereign immunity, we never get past it, even if the conduct is awful, as long as it was done as a part of a government scheme. Well, the problem is that they... The thing is that sovereign immunity and qualified immunity, all those concepts, they derive from the same common law theories. So to the extent that these actions were taken for retaliatory and personal animus reasons, that should be considered. Your position is we can look at the motive of people who are taking official actions and get past sovereign immunity for that reason? To some extent, because that is part of the picture. But here, it's not just the motive. It's the fact that they went against the tribe. They went against the government. They're not properly constituted, and basically, they flouted all laws. And to extend protection to the defendants under these types of circumstances, first of all, is extremely equitable. But secondly, they acted for personal reasons. And once you take them out of that arena and view it as a private dispute between the defendants and the plaintiffs, then we can go forward. There is no sovereign immunity issue. I think we better have you stop for now, and we'll give you a couple of minutes for rebuttal. Thank you, Your Honors. May it please the Court, Sarah Dutch v. Suelo, Counselor of the Defendants in this matter. I think as this panel has rightly recognized, this case is really about the exercise of inherent sovereign authority by the Palaban of Mission Indians. Is there any administrative or judicial remedy inside the tribe? Well, there is, Your Honor. And in this case, this changes from time to time. The tribe is a small tribe. Tell me what judicial remedy these plaintiffs would have inside the tribal courts. As I understand it, there's no tribal judicial remedy for their alleged injuries. Am I correct? That's correct, Your Honor. There is no judicial entity within the tribe that has jurisdiction to hear disputes of this nature. And that distinguishes this case from Santa Clara, does it not? Well, I don't know if it does, Your Honor. I'm not sure whether in Santa Clara... Justice Marshall said in that case, you know, one of the things that's out there, the Indian tribe in that case has its own judicial system, and you ought to go to that one and not come to us. But there's no judicial remedy in this case. That's correct, Your Honor. But I believe the Supreme Court in Santa Clara will also recognize that while there may not be a judicial remedy available in the tribal forum, there are various non-judicial... So tell me what remedies these people have for this alleged conduct inside the tribal forum. Well, in this case, when a determination regarding eligibility is made by the Enrollment Committee, that determination is appealable. That appeal is subject to review by the Bureau of Indian Affairs. The role is limited to an advisory role, and with good reason, which I'm happy to discuss. But the Bureau of Indian Affairs can review the case, review the tribe's determination, and then it comes back to the tribe's Executive Committee for a final determination. Now, in this case, and this is true with many tribes throughout California in particular, you know, different committees serve different roles and people wear different hats. In this case, the Enrollment Committee, generally speaking, is the same as its Executive Committee. But in this case, there was a recommendation from the BIA, wasn't there? Yes, there was, Your Honor. And it didn't avail the plaintiffs? No, the recommendation from the Bureau of Indian Affairs was actually consistent with the Bureau of Indian Affairs' 1989 decision. Right. No, it didn't help them in this particular instance. It was in their favor, but it didn't make any difference to the tribe. Yes, Your Honor. The tribe simply disagreed with that. I mean, I think it's evident from the tribe's recent determination regarding their eligibility for enrollment. So that's not really an administrative remedy. What it allows you to do is get an expert opinion to bring back some evidence that the tribe can consider. And I'm asking about a remedy where somebody can tell the tribal authority that entered the disenrollment letter that to whom they can go and say, tell them they're wrong. Is there anybody they can go to? Well, yes, Your Honor, the tribe's general membership. The tribe's general membership is the ultimate government of the tribe. Now, for purposes of this tribe and conducting business and making decisions, they elect an executive committee, which at the time of the disenrollment in question were the defendants here. But the general membership can, in certain circumstances, speak to issues like this. Now, they haven't here. In the general membership, a ticket could throw out the existing government and put in a new one that would find that these folks were members, correct? Precisely, Your Honor. And why would they do that when their financial interest of the rest of the tribe is to get a bigger cut simply because these people are thrown out? Well, Your Honor, I think the plaintiffs here have inflated. Well, but we're taking the complaint as true. Taking their complaint as it is. You moved to dismiss the complaint. You didn't say, let's wait for summary judgment. So you can't do it both ways. Taking the complaint is true. Let me ask you a second question. Is there any significance to the fact that in March 2001, the tribe withdrew its membership from the intertribal courts of Southern California? There is not. The tribe's action to withdraw itself from the intertribal court had nothing to do with these enrollment decisions. Was there any kind of an inside exhaustion remedy if you're in that intertribal court system or intertribal court, whatever it is, is there any remedy that was withdrawn by them withdrawing there? Not to my knowledge, Your Honor. It is my understanding that the intertribal court would not have had jurisdiction to hear a membership case in any event. I didn't know, and I couldn't find it even on the Internet, though I didn't know whether I could even look there. Yes, yes. You know, I'd like to speak to your point about, you know, what would the motives of the general membership be to overthrow the government, put people back in there that could re-enroll the plaintiffs? I think the answer to that is membership in the tribe is about more than just benefits from a casino. I mean, these people have been native their whole life. The benefits of gaming are only relatively recent. So, you know, this dispute isn't just about money and casino money that comes to individuals. It's a very longstanding dispute that's actually decades old. So could the plaintiffs, if they organized a majority of the tribe, disenroll all of your clients? I suppose that is possible. Without remedy in the federal courts? I suppose that is possible, assuming, of course, that they, you know, have, assuming, of course, that the actions taken by the tribal government are similar to those here. Yes. I mean, they could just, the allegations in the complaint, which I take is true for present purposes, is there was no basis for disenrolling these people, but they just wanted to disenroll them to make money. And so let's assume that the other side gets to a bunch of people and they take over tribal government and they throw out your clients because they want to make money. Is that okay? At least in terms of our review? Well, Your Honor, for the Supreme Court's decision at Santa Clara Pueblo, it is. It is not for the federal courts to make any determinations regarding membership in Indian tribes. If these plaintiffs were banished, would there be a remedy? Well, it depends on the nature. Wouldn't there be a habeas remedy? It depends on the nature of the banishment, Your Honor. There's only one case that came out of the Second Circuit. I'm sorry, I don't remember the year, but it was the Poudre case. And in that case, there was criminal banishment. There was actually a criminal conviction by the tribe for treason. And the individuals were not only disenrolled, but they were banished. And that is the only case where the federal court has found they had jurisdiction to even review anything related. A habeas petition. Yes, a habeas petition. If there were a habeas petition, could we decide enrollment? Wouldn't we have to? I'm sorry? If there were a habeas petition, then a federal court could decide whether people were enrolled as members of the tribe, couldn't it? Your Honor, I'm not entirely sure. That's certainly not the facts that we have here today. But I think the answer is no. Per the Supreme Court's decision in Santa Clara Pueblo, I think the court would be visiting the banishment issue only. I don't know if you can ... Yeah, I guess if the banishment issue were based on the fact that you can't be here anymore, you're not a member of the tribe, and it were a habeas case, we would probably get to that issue, wouldn't we? Well, if you read Gepredo, we look pretty hard at that. Yes, Your Honor. I mean, I think it's hard to say. It depends. I mean, as you've heard from Ms. Lynn, the plaintiffs here, while they've been disenrolled, they have not been banished. It depends on the reasons for banishment. Banishment and disenrollment are not necessarily ... They don't necessarily come together. So what ... Is there any set of circumstances in which ... I mean, she alleges criminal activity, bad motives, usurping of authority, a whole variety of things. There are no circumstances under which those would lead a federal court to be able to review a decision? Is that your position? It's our position that that is correct. With respect to a tribe's inherent right to determine its members, there are no circumstances under which this court could exercise jurisdiction other than limited habeas relief. And the rest of your position, so I understand it too, is that they've got no remedy except electing a new tribal leadership. I suppose the Executive Committee adopted a rule that only 10% of the people found some basis for saying, only people who've been here 30 years can vote on this issue. And they then voted and disqualified from voting two-thirds of the members of the tribe. Would there be anything to do about that? Well, Your Honor, I think the answer to that is looking, again, back to Santa Clara Pueblo. The federal courts do not have jurisdiction to hear matters of that nature. That said, you know, certainly I think this court, it's well established that tribes are subject to the plenary power of Congress. And, you know, 30 years ago in Santa Clara Pueblo, the Supreme Court invited Congress to step in, where, in circumstances... You can't get Congress to do anything. I don't know that any tribe would approve it. But seriously, if they said, okay, we're only going to let people who've been here 50 years vote on this issue. They voted on the issue. They voted to take all the money for themselves. And nobody else was allowed to vote. That would still be... And the others said, well, this is not a legitimate action. You can't, for no reason, eliminate us from voting. There's no remedy for that? Well, Your Honor, if we're talking about your scenario in a membership context, I would say there is no remedy in the federal courts under that scenario. If those individuals remain members, however, there is federal law that authorizes a certain arm of the United States government to oversee, to a limited degree, the tribe's distribution of gaming revenues. So there may, in fact, be a remedy in that scenario. Do you think there may be a remedy through IGRA? There's no private right of action under IGRA. I know. That's why I'm asking. So who does it? Well, in that scenario, I think the National Ending Gaming Commission oversees the distribution of gaming revenue, consistent with the tribe's revenue allocation plan. And in that, in your scenario, Your Honor, they would step in to evaluate whether or not the tribe, in prohibiting members from voting on this... Well, could they do that here? No, Your Honor. Why not? Because here we're dealing with a membership issue. We're dealing with the tribe's fundamental right to determine who its memberships are. Membership is in the first instance. But the membership issue and the revenue issue are the same. Well, not entirely. I would argue that, again, as I started out with in the beginning, the tribe's membership is about much more than just monetary gains as a result of the tribe's gaming activity. But if you say there is a remedy for the distribution of funds under gaming, what is that remedy? Are these people who've been thrown out and titled to go to the regulatory commission and complain about the distribution of funds on the basis that they were improperly thrown out? In this case, they are not, Your Honor, because they are not members of the tribe. If they were members, they could go? If they were members, they would be able to go to the National Indian Gaming Commission and ask for them to conduct an investigation. But that doesn't mean that they could bring an action... And that's what I was going to ask. Is there any provision under IGRA under which any federal authority can say to the tribe, you must distribute your proceeds in this way? There is a provision in IGRA that requires that the tribe distribute proceeds for a certain purposes. Right. And it requires that the tribe adopt its own law governing how it's going to distribute revenue. Right. But that wasn't what I asked. I asked, is there somebody in Washington or in any other place in the world other than on the Apollo Reservation that can come back to you and say, you're not distributing these proceeds correctly, there will be some consequence for that? No, Your Honor. That's what I'd understood, too. Yes. So I guess the question that I was focusing on, I think I've got your answer. The only remedy of these plaintiffs is to elect a new tribal government. Yes, Your Honor. And if they're a minority, that's never going to happen, right? Well, I suppose that could be the case. I don't know. I mean, you may well be correct on your position. The case law certainly favors it, but it's at least in the other cases there seemed to be a tribal remedy for the wrong that was being done. And then we'd say it was up to the Indian courts or it's up to the Indian administrative agencies. And here, no remedy at all, right? If the executive committee said we elect Joe Smith chief and he has all the authority to decide everything, including who is a member, and he decided to disqualify people who had clearly been members for hundreds of years and said, I am the only member, would there be no remedy for that? Well, Your Honor, I don't think there would be a remedy in this court for the court to review a membership determination. But you also said there are not going to be any more votes because none of you are members anymore. I am the sole member. There'd be no remedy for that? Well, I think it's a little more complicated than that. I think in circumstances such as that, we have to bear in mind that the federal government engages in a government-to-government relationship with the tribe. So to a very significant degree, the Bureau of Indian Affairs would be involved in issues, which I think you're suggesting is essentially a leadership issue, which is there would be a remedy there with respect to the Bureau of Indian Affairs to determine who the federal government is going to acknowledge. As the tribal? As the tribe's legitimate body. That said, this court is clearly held, even in leadership issues, the court generally does not have jurisdiction. The BIA has no authority to give a remedy in this case? That's correct, Your Honor. And the Bureau of Indian Affairs has acknowledged their limited role. Thank you. Thank you. So do you have any suggestion, other than a habeas, as to what basis there is to review this? Yes, Your Honor. And actually, there is a similar case in the Central District, I'm sorry, from the District of Columbia, and that's the VAM versus United States Department of Interior, and that's at 701 F3D 927. There are actually two circuit court cases there, and in that particular case, they had the Navajo Nation that disenrolled and disenfranchised former Navajo slaves. And in that particular instance, the court said, we have jurisdiction here, because when the tribal officials act outside their authority, and they violate federal law, then under the ex parte Young Doctrine, we can assume authority over this case. But that was a case in which somebody went to the Department of Interior and said, we want you to say this is not the recognized authority of the tribe, but you're not doing that here. Well, in that particular case, the Department of Interior was also a defendant, but the plaintiffs also named the tribal officials, and the court there actually held that the tribal official could be held accountable in that particular instance. And the court, and I think that case is applicable here, because in this particular instance, we are also alleging that the tribal officers violate a federal law, because they violated the Department of Interior decision. And under those circumstances, there is a basis for the court to say, well, when these defendants violate federal law, and we take actions to reframe them from violating the federal law, he is not the state for sovereign purposes. We're back, as I said, every time we come down to it, we come down to that federal decision that you think is controlling. Yes, Your Honor. All right. Thank you. Just a couple more points, if you don't mind. I know my time is up. One more minute, and then you're going to get cut off. I was going to say, not only up, but up twice. Sorry, Your Honor. I apologize. Okay. Two minutes and 14 seconds, you're going to stop. Okay. Thank you, Your Honor. With respect to the defendant's argument that they could go to the General Counsel and reverse this, well, actually, the plaintiffs here tried. After they were disenrolled, they got a petition with enough signatures to have a General Counsel meeting, but the defendants blocked it. So they had absolutely no remedies whatsoever. And finally, I want to point the court to the case of Sedler v. Yakima, which is a Ninth Circuit case at 419 F2D 486. And in that particular case, and that was brought under the ICRA. That was an habeas petition, right? That was a habeas corpus case. But the court there said that even though the petitioner was not in physical custody, he had no other procedure or recourse for judicial review of the constitutional issues. When was that case issued? That was issued in 1969. All right. Thank you. We looked at that. Thank you. Thank you. The case is here. It will be submitted.
judges: Reinhardt, Smith, Hurwitz